1
2
3
4
5

UNITED STATES DISTRICT COURT

6

FOR THE WESTERN DISTRICT OF WASHINGTON

7

AT SEATTLE

8
9

ROBERT T. and ELIZABETH J. KELLY

10

Plaintiffs,

11

vs.

12

CHASE HOME FINANCE LLC (a subsidiary of
Chase Home Finance Inc.), a Delaware corporation;
and MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC., a Delaware Corporation,

13
14
15

Defendants.

16
17
18
19
20
21
22
23
24
25
26

Case No.:

COMPLAINT FOR:

1. FRAUD/MISREPRESENTATION;

2. VIOLATION OF WASHINGTON
   STATE CONSUMER
   PROTECTION ACT, RCW
   CHAPTER 19.86;

3. ACCOUNTING;

4. VOID CONTRACT FOR
   IMPOSSIBLITY OF
   PERFORMANCE;

5. BREACH OF FIDUCIARY
   DUTY

6. VIOLATION OF THE FEDERAL
   FAIR DEBT COLLECTION
   PRACTICES ACT,

7. VOID CONTRACT FOR
   UNCONSCIONABILITY OF
   CONTRACT;

8. BREACH OF IMPLIED DUTY
   OF GOOD FAITH AND FAIR
   DEALING;

9. RESCISSION/CANCELLATION
   OF CONTRACT;

27

**COMPLAINT - 1**

10. DECLARATORY JUDGMENT AS TO RIGHT TO FORECLOSE ON THE PROPERTY;

11. DECLARATORY JUDGMENT AS TO LACK OF STANDING OF DEFENDANTS

12. DECLARATORY JUDGMENT AS TO MERS' LACK OF ABILITY TO ACT AS A HOLDER OF A BENEFICIAL INTEREST OF A DEED OF TRUST IN WASHINGTON;

13. QUIET TITLE

COME NOW the Plaintiffs, ROBERT T. and ELIZABETH J. KELLY, (hereinafter "Plaintiffs") by and through their attorney of record, Robert J. Penfield of Penfield Legal Services, PLLC, to bring a complaint against the Defendants above named, and allege as follows:

## A.      INTRODUCTION

1.1      This is an action for 13 causes of action related to the illegal origination and securitization of a Loan, as well as illegal collection efforts by the alleged owner of that Loan, and the agents of that Originator, WASHINGTON MUTUAL BANK, and alleged owner of the Loan.

1.2      Many homeowners in foreclosure find that their loans are allegedly owned by an entity that they never were informed would be involved in their loan at the time they sought the funds they borrowed.  That entity, usually a bank or other large financial institution including FREDDIE M AC, FANNIE MAE, GNMA, or the VA, is commonly called a "Trustee for the Certificate Holders" of a Home Loan Securitization Trust.

1.3      In the past two decades, tens of millions of residential mortgages were bundled together (often in groups of between 1,500 and 5,000 loans), and investors were offered the opportunity to buy shares of each bundle.  This process is known as "securitization."

1.4      Each such bundle of residential mortgages was given a name, such as "ABC Securities Inc., Asset-Backed Pass-Through Securities, Series 2006-A5."  The name indicates

**COMPLAINT - 2**

information about the particular trust such as the year it was created (2006) and its contents (with ABC indicating by whom the loans in that particular trust were originally made).

1.5     Each Trust is governed by a Pooling and Servicing Agreement ("PSA").  The PSA sets forth what happens after the loans are bundled together, and sets a Cut-Off Date.  The Cut-Off Date is the date upon which all loans in the Trust must be identified, and by which title to the loans must pass. All documents evidencing the loans must be physically and legally transferred into the Trust by the Cut-Off Date.  The original PSA will also have a complete list of all loans that are allegedly in the Trust upon the Cut-Off Date.

1.6     There are several complicated structures that can be used in a securitization.  In one common type of securitization, under the PSA, a "Depositor" is an entity that aggregates loans purchased or otherwise obtained from subsidiaries of the Depositor or smaller lenders, which originated the loans that the Depositor aggregates for sale.  These entities are known as "Originators."

1.7     Under the PSA, the Originators sell their loans to the Depositor, which then sells the bundle of loans to a "Trustee," which is a separate entity that holds the loans "in trust," as the backing for "pass-through certificates" (i.e., securities) that are issued by the Depositor and purchased by Investors.  The funds from the Investors' purchases of the pass-through certificates are used to fund the underlying loans that were bundled.  The pass-through certificates are documents that evidence that the Investors hold a beneficial interest in the Trust.  In short, two distinct true sales (as distinguished from merely a financing arrangement) of each loan (generally evidenced by a promissory note and deed of trust when originated West of the Mississippi River, and by a promissory note and mortgage East of that river) must occur in order to properly transfer each loan into the Trust.

1.8     Each Trust also has a Closing Date, which is the last date that the individual loans (and their evidencing documents) can be transferred into the Trust.  Each Trust has a Trustee, which must certify that for each loan: (1) the Trustee has possession, within the time allowed by the PSA

**COMPLAINT - 3**

(and applicable IRS Code sections which allow an additional 90 days for transfer into the Trust, on pain of the Trust losing its extremely important tax exempt status); (2) a promissory note that is endorsed in the manner described in the PSA (typically either in blank, or using specific language naming the Trustee of the Trust and the name of the Trust); and (3) proof that the ownership of the note has been transferred.  This proof is most often an Assignment of Note and Deed of Trust (in Western states) or an Assignment of Mortgage (in Eastern States).

1.9     The PSA will declare that if a loan is not transferred to the Trust within 90 days after the Closing Date, the loan can NEVER be transferred into the trust without incurring severe IRS penalties and possibly endangering the tax exempt status of the Trust. In addition, the PSA will require that a non-performing loan (i.e., a loan that is in default) can also NEVER be transferred into the Trust.

1.10    According to the PSAs, the Assignment(s) are supposed to be recorded in the County where the property is located, and the original kept with the other documents evidencing the loan that are transferred to the Trust.  Unfortunately, this was rarely, if ever done, in millions of instances, resulting in attempted transfers to securitization Trusts that are legally void; the almost universal practice of the transferring entities being to wait until a defaulted loan was referred for foreclosure action before attempting the transfer.

1.11    Some of the loans in the Trust inevitably go into default and a foreclosure process is started.  In Washington, that process is usually a non-judicial process that involves a trustee company being assigned the trustee interest on the original Deed of Trust; thereafter the foreclosing trustee prosecutes the non-judicial foreclosure.  The foreclosing trustee will claim that it has obtained the loan, or the right to foreclose, from the Originator of the loan.  However, the foreclosing trustee never mentions the complicated series of transactions that occurred prior to the foreclosing trustee's recording a Notice of Trustee's Sale; and furthermore is never called on by anyone to prove that the entity that assigned it the right to foreclose (the Trustee of the securitization Trust) ever had the right to do so.

**COMPLAINT - 4**

1.12    In the rush to create these Trusts and sell shares to Investors in order to fund the loans, proper Assignments from the Originators to the Depositor, and then from the Depositor to the Trustee of the Trust were not prepared, filed or recorded, nor was physical control of the documents underlying the loans transferred to the Trustee as required by the PSA.  This means that the entity that is seeking to foreclose can never prove the chain of ownership, and that it is in fact impossible for the Trustee of the Securitization Trust to EVER obtain title to the loan and loan documents such that it can foreclose on the loan in accordance with the PSA or the law of the jurisdiction where the property securing the loan is located.

1.13    In most cases, the Originator of the loans retains the right to service the loans for a fee.  The homeowner, thinking that they merely walked into a particular bank and borrowed money from that bank, in exchange for a promissory note and deed of trust, has no idea that its servicer (the same entity that originated the loan) no longer has an ownership interest in the loan.

1.14    When widespread defaults occurred, beginning in 2006, the Trustees of the Trusts, the local foreclosing trustees, and their lawyers discovered in the foreclosure process that the Assignments either could not be located, certain states did not allow blank Assignments or Assignments with retroactive effective dates, or these Assignments had never been recorded as originally required by the PSA.  To solve this problem, an Assignment would be created by someone working for the Servicer, the Trustee of the Securitization Trust, or the foreclosing Trustee, long after the date upon which the Trustee of the securitization Trust could ever legally receive title to the evidencing documents to the loan. The purported Assignment would then be recorded in the County records where the property secured by the deed of trust being foreclosed was located.

1.15    Also, and again almost universally, most cases involve Assignments that are "robo-signed" by individuals who have no actual personal knowledge that the loan documents were ever delivered to the Trustee of the Securitization Trust, and are therefore fraudulent Assignments that are legally void.  In addition, the Assignments are dated months or years after the Closing Date

**COMPLAINT - 5**

established in the PSA plus the 90 requirement and therefore are legally deficient to evidence a transfer into the Securitization Trust.

1.16    Further, involvement of a company called Mortgage Electronic Registration Systems, Inc., "MERS", in the holding of the beneficial interest in the deed of trust that secures the pooled loans causes an additional fatal flaw in the transfer attempts.  MERS is a company that was created merely to track and register securitized loans, yet in tens of millions of cases, was given a "nominal beneficial interest" in the deeds of trust securing the subject loans.  Though MERS was given this status, it never collected payments or ever held the notes in question, as a beneficial interest holder normally would.  MERS is not legally entitled to hold the beneficial interest in a deed of trust in Washington, and therefore cannot effectively execute an Assignment of the beneficial interest to a new party.

1.17    In almost all cases, the Assignment is a "smoking gun" that shows that title to the documents evidencing the loan (and therefore the beneficial interest in the deed of trust being foreclosed) was never transferred into the Securitization Trust as required by the PSA.  Likewise, in almost all cases, the Assignment is fraudulently signed and notarized, and would not be effective to pass title or a beneficial interest for those reasons.  Finally, in almost all cases, the date of the attempted Assignment is outside the time frame in which title or the beneficial interest in the loan could legally be transferred.

1.18    In lieu of valid Assignments, Trustees of Securitization Trusts, such as WASHINGTON MUTUAL BANK in the present case, continue to rely upon Assignments that fail to effectuate or properly evidence the transfers they purport to convey.

1.19    WASHINGTON MUTUAL BANK and its servicers have another problem that has gone unremarked upon nationally, for the most part, but which may expose those entities to enormous potential liability far larger than that which the present lawsuit represents:  Because none of the promissory notes and deeds of trust that were supposed to be transferred to CHASE HOME FINANCE LLC (a subsidiary of Chase Home Finance Inc.), were legally transferred to it under the

**COMPLAINT - 6**

rules set forth in the PSAs for each of those Trusts, the "securities" issued by the Depositors, and sometimes by the Trusts themselves, are not "Asset-Backed Securities" as intended by the parties to the PSAs, but rather they are simply unsecured loans from the Investors who bought what they believed were "Asset-Backed Securities" to the Depositors, in exchange for worthless certificates.

1.20    One final scandal in the securitization scheme is that each of the loans in the Securitization Trusts were normally insured by between one and ten face value insurance policies that would pay off all of the loans in a particular Trust once a certain percentage of the loans in that Trust went into default. The result of this practice was that almost all foreclosures that are conducted in the United States currently are merely an insurance company, while holding a note stamped "paid in full," attempting to bootstrap itself onto a still-recorded deed of trust for that note, rather than pursuing its subrogation rights against the borrower on the note by the normal practice, namely a civil lawsuit.  The practical effect of this aspect of the securitization scandal is that almost all foreclosures of mortgages or deeds of trust are illegal.

1.21    Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, each of the defendants were the agents, employees, partners, joint venturers, coconspirators, successors or predecessors in interest, owners, principals, and employers of the remaining defendants, and in doing the things hereinafter alleged, were acting within the course and scope of such agency, partnership, employment, ownership, joint venture and/or conspiracy.

1.22    Plaintiffs are further informed and believe and based thereon allege that the acts and conduct herein alleged of each such Defendant were known to, authorized by, and/or ratified by the other Defendants, and each of them.

1.23    Whenever in this Complaint an act or omission of a corporation or business entity is alleged, said allegation shall be deemed to mean and include an allegation: (1) that the corporation or business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees, acting within the course and scope of their duties; (2) that the act or omission

**COMPLAINT - 7**

was authorized by corporate managerial officers or directors; and (3) that the act or omission was ratified by the officers and directors of the corporation.

1.24    While the complained of loan was originated by WASHINGTON MUTUAL BANK, any and all subsequent alleged holders of the Note, took the Notes subject to all defenses which the Plaintiffs may have had against WASHINGTON MUTUAL BANK before it folded, and any other successors to these Notes and Deeds of Trust in accordance with well-established law.

1.25    No party named herein is a minor, in the military service of the United States, as defined by the Soldier's and Sailor's Relief Act, or otherwise incompetent.

1.26    The facts set forth above in paragraphs 1.0 through 1.25 are general facts that are true for almost all securitized loans.  They are incorporated by this reference into the fact section below as being relevant to the causes of action that follow.


## B.    FACTS/PARTIES

2.1    Plaintiffs, ROBERT T. and ELIZABETH J. KELLY, husband and wife, currently reside in Washington State and at all times herein mentioned were and continue to be the owners of the parcel of improved real property located in Grays Harbor County, Washington, hereinafter referred to as the "PROPERTY".

2.2    WASHINGTON MUTUAL BANK, ("WAMU") is an inactive corporate entity organized under the laws of the State of Washington, purporting to have its corporate headquarters at 1201 Third Ave. WMT 1706, Seattle, WA 98101.  WAMU is not being sued in this case.

2.3    JPMorgan CHASE is allegedly the Trustee of an unknown securitization Trust, in which Plaintiffs' Loan should be found, but which because of various fraudulent and illegal practices, the Note and the DOT that secures that Note cannot be found, and can NEVER be placed in Trust, nor can a legal foreclosure EVER be conducted on the DOT.

2.4    JPMorgan Chase falsely claims to hold the beneficial interest in the DOT which serves as security for Plaintiffs' Loan, more fully described below.

**COMPLAINT - 8**

2.5     CHASE HOME FINANCE LLC (a subsidiary of Chase Home Finance Inc.), ("CHASE") is a corporate entity organized under the laws of the State of Delaware, purporting to have its corporate headquarters at 343 Thornall Street, Suite 7, Edison, NJ 08837. At all times relevant to the claims pled herein, CHASE conducted business in the state of Washington, county of Grays Harbor.

2.6     CHASE is the current Servicer of Plaintiffs' Loan, and as such claims the ability to conduct itself as if it was standing in the shoes of WAMU and/or WAMU.

2.7     While the specific acts and omissions referenced herein were committed by WAMU, liability therefore is imputed upon WAMU, as its successor-in-interest and due to the fact that certain defenses are not available to a "holder in due course" which are the subject of this action.

2.8     Defendant Mortgage Electronic Registration Systems, Inc., ("MERS") is a Delaware corporation that claimed an interest in the DOT that secured the Loan described more fully below, that it was not entitled to hold, and which fraudulently attempted to transfer the Loan and the DOT securing that Loan to WAMU.

2.9     WAMU is listed on the MERS website as the "Investor" for Plaintiffs' Loan.

2.10    CHASE HOME FINANCE LLC is listed on the MERS website as the "Servicer" of Plaintiffs' Loan and has collected numerous payments from Plaintiffs on that Loan.

## C.     LOAN

3.1     On or about June 7, 2007, Plaintiffs borrowed $304,000 ("Loan") from WAMU, and evidenced that Loan with a written promissory note ("Note"), the performance of which was secured by a written deed of trust ("DOT") recorded on June 13, 2007, against Plaintiffs' property ("Property") located at 32 North First Street, Pacific Beach, WA 98571 as Grays Harbor County Auditor/Recorder's document recording number 200706130077.

**COMPLAINT - 9**

3.2     The abbreviated legal description for Property is: LOT 8, BLOCK 4;

ROUNDTREE'S ADDITION TO PACIFIC BEACH, AS PER PLAT RECORDED IN

VOLUME 4 OF PLATS, PAGE 24, RECORDS OF GRAYS HARBOR COUNTY

3.3     Property is more commonly known as: 32 North First Street, Pacific Beach,

WA 98571;

3.4     Grays Harbor County APN:  809500400800.

3.5     Although CHASE is listed on the MERS website as being the "Investor" for

Plaintiffs' Loan (i.e., assumed to be the "true owner" of the Note and therefore that entity entitled to

both receive payments from Plaintiffs and enforce Note by way of DOT, the written Assignment

that was recorded in the Property Records of Grays Harbor, as Auditor/Recorder's document

recording number, is a MERS executed Assignment, and as such is of no force and effect.

3.6     Plaintiffs are without any reliable information as to what, if any, entity is entitled to

collect payments on the Loan and/or enforce the DOT, nor do Plaintiffs have any knowledge as to

where the series of payments they have tendered on the Loan may have wound up over the life of

the loan. Plaintiffs have a reasonable and well-founded fear, based on a reasonable understanding of

the fraudulent nature of the loan securitization process, that some or all of those payments may

never have been properly credited to the Loan.

3.7     Upon information and belief, Plaintiffs allege that none of the named Defendants, nor

their agents, have ever been the legal, nominal, or equitable owners of any portion of the beneficial

interest in DOT securing the Loan, and further that none of the named Defendants, nor their agents,

have ever had any legal, nominal, or equitable right to collect payments on the Loan.

### D.     JURISDICTION

**COMPLAINT - 10**

4.1     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that the amount in controversy is in excess of $75,000.00 and there is diversity between Plaintiffs and the named Defendants with in regard to state of residence and/or principal place of business.

### E.     VENUE

5.1     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) since a substantial part of the events or omissions giving rise to this claim occurred in this District.

### F.     CAUSES OF ACTION
### I.     First Cause of Action – Fraud/Misrepresentation
### (AGAINST ALL DEFENDANTS)

6.1     Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 5.1.

6.2     On or about  June 7, 2007, Plaintiffs borrowed money from WAMU, believing that they were simply receiving funds from WAMU and giving back a Note and DOT for that Loan, in a typical real estate lending transaction.

6.3     Plaintiffs entered into the Loan transaction in part because of the simplicity and structure of that transaction, and because they believed that they were simply borrowing money from a single bank, WAMU.

6.4     Each of Plaintiffs' payments made on the Loan to CHASE when it asserted a right to service the Loan on behalf of WAMU, were made to an entity that did not have a legal or equitable right to receive those payments.

6.5     WAMU, and CHASE intended that Plaintiffs rely upon their silence as to who the true entity was that was entitled to receive payment on the Loan, so that Plaintiffs would continue to make monthly payments to them, despite their not having any legal or equitable right to collect as the proper payees on the Loan.

**COMPLAINT - 11**

6.6     The amount of the payments Plaintiffs have made to an entity that is not legally entitled to receive those payments is an amount that will be proven at trial.

6.7     The Property is a unique and irreplaceable piece of real property.

6.8     A foreclosure action has been started on the Properties by WAMU, acting through CHASE.

6.9     Because monetary damages cannot alone adequately compensate the Plaintiffs for the fear of the loss of their investment property, any foreclosure action on the Property should be prevented if one is commenced, and damages awarded to Plaintiffs for the full amount of the payments they have made to CHASE on the Loan.

6.10    Plaintiffs are entitled to reimbursement of their reasonable attorney fees and costs incurred in an amount to be proven at trial for pursuing the causes of action set forth below, under applicable statute, case law, and contract.


II.     **Second Cause of Action - Violation of the Washington State Consumer Protection Act (RCW 19.86 et seq.)**

**(Against All Defendants)**

7.1     Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 6.10.

7.2     WAMU and Defendant CHASE and Defendant MERS initiated and caused to be completed against Plaintiffs by causing to be recorded a false Assignment of Mortgage, in order to foreclose upon residential properties;

7.3     WAMU and Defendant CHASE have violated the Consumer Protection Act, RCW 19.86, et seq., through a course of conduct in collecting payments from Plaintiffs to which they are not entitled, having no legal or equitable interest whatsoever in Plaintiffs' Loan or in the DOT securing that Loan, and in failing to inform Plaintiffs of the true ownership of that Loan/DOT.

**COMPLAINT - 12**

7.4     Collecting payments from Plaintiffs to which they are not entitled while having no legal or equitable interest whatsoever in Plaintiffs' Loan or in the DOT securing that Loan, and in failing to inform Plaintiffs of the true ownership of that Loan/DOT constitutes WAMU and Defendant CHASE and Defendant MERS acting deceptively.

7.5     WAMU and Defendant CHASE and Defendant MERS engaged in these activities as part of a normal course of business and commerce.

7.6     Such activities are likely to be repeated affecting the people of the State of Washington.

7.7     The public interest is negatively impacted by the pattern of conduct engaged in by WAMU and Defendant CHASE, and Defendant MERS as evidenced by the acts herein and the obvious potential for repetition.

7.8     The Plaintiffs have suffered injury as outlined above and below, in addition to the distraction and loss of time to pursue business and personal activities due to the necessity of addressing the wrongful conduct of WAMU and Defendant CHASE and Defendant MERS through this and other actions.

7.9     Plaintiffs' injuries are solely the result of the conduct of WAMU and Defendant CHASE and Defendant MERS.

7.10    Plaintiffs are entitled to their actual damages in an amount to be proven at trial, and to treble damages up to an additional $10,000.00 for defendant's violations of the Washington CPA, in addition to reimbursement of their attorney fees and costs related to pursuing these causes of action.

### III.    Third Cause of Action – Accounting

### (AGAINST DEFENDANT CHASE HOME FINANCE, LLC)

8.1     Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 7.10.

**COMPLAINT - 13**

8.2     The amount of money still owed to the named Defendants is unknown to Plaintiffs and cannot be determined without an accounting.

8.3     Plaintiffs demand that the Court render between Plaintiffs and the named Defendants, an accounting determining the amount, if any, actually owed to the named Defendants by Plaintiffs.

## IV.     Fourth Cause of Action - To Void Contract Based on Impossibility of Performance (Against Defendant CHASE HOME FINANCE LLC)

9.1     Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 8.3.

9.2     An important metric when considering a borrower's ability to repay a loan is a borrower's debt-to-income ratio, or DTI, which reflects the increased risk that borrowers whose debt is relatively high compared to their income will default on their loans.

9.3     The purpose of an underwriter is to determine whether the borrowers can qualify for a loan and if the borrowers have the ability to repay the loan.

9.4     This determination of the ability to repay a loan is based upon employment and income in large measure, which is proved by getting pay stubs, 1040's, W-2's and a Verification of Employment and Income on the borrowers.

9.5     If an underwriter has evaluated the loan properly, then there should be no question of the ability of the borrower to repay the loan.

9.6     Debt ratios will have been evaluated, credit reviewed and a proper determination of risk made in relation to the loan amount.

9.7     Approvals and denials would be made based upon a realistic likelihood of repayment.

9.8     Debt to Income ratios are calculated using the borrower's gross income and only includes the Principle, Interest, Taxes, and Insurance (PITI) payment of the proposed loan and the minimum payments showing on the borrower's credit report.

**COMPLAINT - 14**

9.9      DTI does not include any other payments such as insurance premiums, gas, food, utility payments, tuition, clothing, child care, etc.

9.10     Historically normal underwriting practices include analysis for a 28/36% debt-to-income ratio, which means that a borrower could afford to have 28% of their gross income go to their housing payment and have a 36% total debt ratio with a reasonable expectation that the borrower would not default on the loan.

9.11     Any percentage higher than this would greatly increase the likelihood of default.

9.12     While a borrower's current DTI is good measure of his or her capacity to repay a fixed rate mortgage, other loan products, such as adjustable rate mortgages ("ARMs"), have initial "teaser" rates that reset at much higher index rates after a certain period.

9.13     A "fully indexed rate" accounts for this interest rate reset, and represents the interest rate over the life of the loan, calculated by adding the index rate at origination and the margin that a lender adds to the index rate after the initial "teaser" period.

9.14     If the current index rate is 2.5%, and if the margin on a particular loan is 3%, the fully indexed rate on that loan is 5.5%. Because the fully indexed rate accounts for the current value of the interest rate index used by an ARM, it is a better measure of a borrower's ability to repay the loan.

9.15     The underwriting process for The Loan was flawed in that it did not take the borrower's debt ratios into consideration when approving the Loan because the Loan far exceeded the 28/36% DTIs.

9.16     No consideration of the ability of the borrower to repay the Loan with a realistic means test was therefore made.  The lender knew that the borrower could not afford to pay these loans back but approved the loan regardless.

9.17     The Defendants, and each of them, together with any Defendants claiming to be a holder in the course of the Note knew, or should have known, based upon the actual income information provided by Plaintiffs to the WAMU.  WAMU knew, or should have known, that

**COMPLAINT - 15**

Plaintiffs could never have performed in accordance with the terms set forth in the written contract over the life of the loan, because the Loan was underwritten using only the minimum payment due, which is not enough to even cover the interest due each month on the Loan, resulting in negative amortization and a loan that would never be paid off.

9.18    Defendants, and each of them, knew or should have known that the written contract provided for a negative amortization payment schedule, and as such, as the payments were set forth, there was no way that the loan would be repaid by the date set forth in the Note.

9.19    Despite being in possession, at all times of the information noted above, Defendants, and each of them, together with any Defendants claiming to be a holder in due course of the Note, produced and tendered the loan documentation to Plaintiffs and sought to obtain the signature of Plaintiffs upon all such documentation, knowing at the onset of the written contract that performance in accordance with the terms, was impossible.

9.20    Defendants, and each of them, knew or should have known that Plaintiffs would be forced to refinance each of these Loans at some point in the future in order to pay off the loan in accordance with the repayment date set forth in the Note.

9.21    Given that at the time the loan documents for the Loan was executed by Plaintiffs it was impossible for Plaintiffs to ever repay the Loan in accordance with the date set forth on the Note, and the Note for the Loan was void at the time of its execution and an Order so stating should be issued by this Court.

9.22    Each of the above violations is subject to civil remedies in law and equity, in addition to the recovery of attorney's fees and costs of litigation.


### V.    Fifth Cause of Action – Breach of Fiduciary Duty
### (Against DEFENDANT CHASE HOME FINANCE LLC)

10.1    Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 9.22.

**COMPLAINT - 16**

10.2    Defendants owed common law fiduciary duty to the Plaintiffs because those Defendants agreed to act as Plaintiffs' agent and the Plaintiffs placed their trust and confidence in the Defendants and relied on the Defendants to exercise their skills and expertise for Plaintiffs' benefit.

10.3    Defendants also owed statutory fiduciary duties to the Plaintiffs under RCW § 19.146.095 and RCW § 61.34.060.

10.4    At all times relevant, Defendants, through their agents, created, accepted and acted in a fiduciary relationship of great trust and acted for and were the processors of Property for the benefit of Plaintiffs.

10.5    Defendants, and each of them, breached their fiduciary duties owed to Plaintiffs as they have acted and continue to act for their own benefit and to the detriment of Plaintiffs.

10.6    Among other things, they have placed and negotiated loans without due care to the best interests of Plaintiffs and for the protection of their rights.

10.7    Defendants and each of them breached their fiduciary duty owed to Plaintiffs by violating in extorting and demanding sums they were not entitled to receive by charging "junk fees" and utilizing a "yield spread" scheme.

10.8    Defendants and each of them breached their fiduciary duty owed to Plaintiffs by luring Plaintiffs into a loan and then requiring performance under a loan document which was intentionally incomprehensible and filled with legalese.

10.9    The Defendants also concealed the true nature and terms by providing a "disclosure" of what the "loan payment" would be, knowing at the time they made such statements, that if Plaintiffs in fact made those stated payments, the negative amortization feature of the loan would cause thousands of dollars to be added to the principal each month, effectively drowning Plaintiffs in a sea of debt that, based on the true income which Plaintiffs provided to the named Defendants, they knew they would never escape from.

**COMPLAINT - 17**

10.10   This incomprehensibility was intended to ensure that the Plaintiffs did not comprehend its terms, which in turn permitted the Defendants and their successors to mislead the Plaintiffs and thereby financially profit from its terms.

10.11   The Defendants and each of them continued this action by demanding performance and payment of money, justifying these demands by the incomprehensible language of the subject loan.  Defendants and each of them, breached their fiduciary duty owed to Plaintiffs by violating the accurate disclosure requirements of the loan and by failing to comply with the Federal Truth in Lending Act (15 U.S.C §§1601-1666) and with the Act's corresponding Regulation Z (24 C.F.R. §§3500.1-3500.17) and thereafter by willfully failing and refusing after demand made to correct these inaccuracies.

10.12   Defendants and each of them breached their fiduciary duty owed to Plaintiffs by concealing from Plaintiffs that the subject loan was a negative amortization loan.

10.13   They concealed from the Plaintiffs the fact that this Loan could never be paid off by its terms by the payments as set forth in the Truth in Lending Disclosure.

10.14   Defendants and each of them breached their fiduciary duty owed to Plaintiffs by luring Plaintiffs into a more expensive and higher interest rate loan than what they would and should have qualified for, and lied to the Plaintiffs in doing so.

10.15   Defendants and each of them breached their fiduciary duty owed to Plaintiffs by placing them into a Stated Income loan, knowing that such loan was not available to them as a wage earner, thus exposing them to liability for future actions.

10.16   Defendants and each of them, breached their fiduciary duty owed to Plaintiffs by intentionally placing them into a loan program without any realistic test as to their ability to repay the Loans, knowing that they themselves inflated their true income in order to "seal the deal" and profit from the transaction, to the detriment of Plaintiffs.

10.17   The conduct of Defendants and each of them was willful, intentional, purposeful, and done with the sole intention to profit, to the detriment of Plaintiffs.

**COMPLAINT - 18**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

10.18   As a consequence and proximate result of the aforementioned acts and breach of their fiduciary duties, by Defendants and each of them, Plaintiffs sustained damages in an amount not yet ascertained to be proven at trial.

10.19   The conduct of Defendants and each of them as herein alleged was a substantial factor in causing the damages sustained by Plaintiffs and as a direct, proximate and legal result of the above alleged breach of fiduciary duty, Plaintiffs have suffered and will continue to suffer damages in an amount not yet ascertained to be proven at trial, including, but not limited to, damages for loss of property, money, and damages for emotional distress.

10.20   Defendants and each of them are guilty of malice, fraud or oppression, Plaintiffs should therefore recover punitive damages in addition to actual damages.

10.21   Each of the above violations is subject to civil remedies in law and equity, in addition to the recovery of attorney's fees and costs of litigation.

## VI.    Sixth Cause of Action - Fair Debt Collection Practices Act (FDCPA)
## (DEFENDANTS CHASE HOME FINANCE LLC. and MERS)

11.1    Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1. through 10.21.

11.2    The Fair Debt Collection Practices Act, or FDCPA, 15 U.S.C. § 1692 et seq., a United States statute added in 1978 as Title VIII of the Consumer Credit Protection Act, broadly defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." The Act prohibits certain types of "abusive and deceptive" conduct when attempting to collect debts.

11.3    CHASE falls under the definition of Debt Collector for purposes of the FDCPA because it was not the originators of the Loan.

**COMPLAINT - 19**

11.4    A review of Plaintiffs' file reveals that WAMU and Defendants CHASE and MERS have violated the FDCPA by initiating a non-judicial foreclosure action by recording a false and fraudulent assignment of mortgage.

11.5    Each of the above violations is subject to civil remedies in law and equity, in addition to the recovery of attorney's fees and costs of litigation.

## VII.    Seventh Cause of Action - To Void Contract Based on Unconscionability of Contract (AGAINST DEFENDANT CHASE)

12.1    Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 11.5.

12.2    If the Court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

12.3    The Loan contract governing the Loan is unconscionable for the following reasons:

a.      Defendants breached their fiduciary duties owed to Plaintiffs by falsifying loan documents and thus engaging in fraud.

b.      Defendants knew Plaintiffs would never have qualified for the Loan based upon their true income, therefore they avoided documenting the loans properly, failed to verify Plaintiffs' income by "turning their head away," which was required by law and placed them in a Stated Income loan which was not available to wage earners at the time the subject loan was funded.

c.      Defendants essentially "promoted" Plaintiffs into a completely unauthorized and lucrative profession, without their knowledge or consent, for the sole purpose of "closing the deal" and having them approved for a loan that they knew, based on Plaintiffs' true income, they would never have been able to have afforded over the life of the loan.

d.      Defendants and each of them, including their respective agents, never explained to Plaintiffs the truth, that the mortgage payments could and would be more than what was represented and stated in the Truth in Lending disclosure document.

**COMPLAINT - 20**

e.     The subject Loans were a negative amortization loans, a fact which all Defendants through their agents, affiliates and employees and independent contractors, conspired, each with each other, to conceal and attempted to conceal from Plaintiffs.  Plaintiffs believed they were paying the amounts as due in the Truth in Lending Disclosure and that they would be able to liquidate or extinguish the Promissory Note by the date stated in the Promissory Note.  They further believed that the payments, during the first portion of the repayment schedule, would further accomplish this. However, the balance due on the Loans increased rather than decreased.

f.     The Plaintiffs have been informed and believe and thereupon allege that they would have qualified for a loan with better terms such as a fixed rate loan or a "safer" loan product.

g.     The Plaintiffs would have been approved for a better loan with a fixed interest rate, instead of the exploding ARM they were lured into accepting.

h.     The Loans extended to Plaintiffs were generally extended to those people with much worse credit and foreclosures in their history, not for potential borrowers with the stellar credit scores of the Plaintiffs.

i.     The Defendants knew that the loans were exactly opposite of what Plaintiffs had requested, specifically, a lower interest rate, lower payments and possibly cash out to perform some home improvements. Instead they were lured into accepting a loan with a false "teaser rate" of interest, which later soared into an exploding ARM, subject to negative amortization which added over principal each month to the principal balance.

j.     Defendants' actions in this matter have been willful and knowing and/or with complete and reckless disregard of the emotional or financial ramifications that would surely befall Plaintiffs once the Loan adjusted.

12.4     Each of the above violations is subject to civil remedies in law and equity, in addition to the recovery of attorney's fees and costs of litigation.

## VIII.   Eighth Cause of Action - Breach of Implied Covenant of Good Faith and Fair Dealing

### (AGAINST ALL DEFENDANTS)

13.1     Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 12.5.

13.2     Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

**COMPLAINT - 21**

13.3    This implied covenant of good faith and fair dealing requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement.

13.4    The covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to accomplish its purpose.

13.5    This covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

13.6    The terms of the Promissory Note and the Deed of Trust imposed upon WAMU, as well as the other Named Defendants, the affirmative duty of good faith and fair dealing in this matter.

13.7    Defendants enjoyed substantial discretionary power affecting the rights of Plaintiffs during the events alleged in this Complaint. Defendants were required to exercise such power in good faith.

13.8    Defendants willfully breached their implied covenant of good faith and fair dealing with Plaintiffs when Defendants:

  a.    Failed to provide all of the proper disclosures;

  b.    Did not provide an accurate Truth in Lending Disclosure for the Loan;

  c.    Placed Plaintiffs into the Loan where it was likely that Plaintiffs would default or incur bankruptcy as a result of the Loan and it was reasonable foreseeable that such would occur;

  d.    Offered a product that was not suited to the financial circumstances and status of Plaintiffs;

  e.    Falsified loan documentation in order to "close a deal" to the detriment of Plaintiffs;

  f.    Placing Plaintiffs into the Loan whereby the Plaintiffs could be liable for actions that the Plaintiffs are unaware of;

  g.    Placing the Plaintiffs into the Loan with a significantly higher monthly payment in order to receive Yield Spread Premiums on the Loan;

**COMPLAINT - 22**

h.   Fraudulently inducing Plaintiffs to enter into the Loan transactions which were contrary to Plaintiffs' stated intentions, contrary to their interests, and contrary to the preservation of their Properties;

i.   Placing Plaintiffs into the Loan without a realistic test of the ability of the Plaintiffs to repay the Loan; and,

13.9   As a result of Defendants' multiple breaches of this covenant, Plaintiffs have suffered injury and will cause Plaintiffs to suffer the loss of the Property.

13.10   Plaintiffs have incurred and continue to incur attorney's fees and other costs and expenses to right this wrong.

13.11   WAMU and Defendants CHASE and MERS' actions in this matter have been willful, knowing, malicious, fraudulent and oppressive, entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

13.12   Each of the above violations is subject to civil remedies in law and equity, in addition to the recovery of attorney's fees and costs of litigation.


### IX.   Ninth Cause of Action - Rescission/Cancellation

### (AGAINST DEFENDANT CHASE)

14.1   Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 13.12.

14.2   Plaintiffs allege that the Loan was underwritten by the WAMU through mistake and fraud by engaging in deceptive practices as alleged herein.

14.3   WAMU, with intent to deceive Plaintiffs to consent to the Loan, knew or should have known Plaintiffs would not understand the true costs of the Loan; and which Defendants, and each of them, did fraudulently conceal from Plaintiffs.

14.4   The active misrepresentations of WAMU and Chase, and their silence and deceit, were false and fraudulent.

**COMPLAINT - 23**

PENFIELD LEGAL SERVICES, PLLC
11661 SE 1ST STREET, SUITE 100
BELLEVUE, WA 98005
888-543-0048

14.5    At the time WAMU made the misrepresentations and engaged in the conspiracy to conceal and deceive as herein alleged, and at the time Plaintiffs applied for the Loan, Plaintiffs did not know that the misrepresentations, deceit and inducements by WAMU were false and fraudulent, but instead believed them to be truthful and reasonable to be relied upon, and in fact did rely upon WAMU's representations, thereby entering into the Loan transaction without the benefit of the true facts, and by coercion and mistake.

14.6    As a result of the fraudulent misrepresentations and deceit by WAMU, Plaintiffs have incurred substantial financial damages as herein alleged.

14.7    Plaintiffs hereupon serve notice of their demand for rescissionary damages on the grounds of fraudulent misrepresentations, deceit and mistake by WAMU, and each of them, as alleged herein.

14.8    To the extent that Plaintiffs' Loan transaction documents contain an exculpatory clause in favor of WAMU from their own fraud, Plaintiffs allege that such a clause is unenforceable pursuant to the common and statutory law of Washington.

14.9    Plaintiffs hereby demand restitution from WAMU in an amount that will restore Plaintiffs to a position they would have been in had WAMU not engaged in the willful, intentional and purposeful conduct herein alleged.

14.10   Plaintiffs further allege that WAMU, have been unjustly enriched by the actions herein alleged and all the fees, profits, payments and commissions earned by WAMU must be disgorged by WAMU and CHASE to Plaintiffs.

14.11   Each of the above violations is subject to civil remedies in law and equity, in addition to the recovery of attorney's fees and costs of litigation.

**X.      Tenth Cause of Action - Declaratory Judgment as to Right to Foreclose on the**
**Property**
**(AGAINST ALL DEFENDANTS)**

**COMPLAINT - 24**

PENFIELD LEGAL SERVICES, PLLC
11661 SE 1ST STREET, SUITE 100
BELLEVUE, WA 98005
888-543-0048

15.1    Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 14.11.

15.2    Chapter 7.24, Revised Code of Washington, authorizes the Courts to answer questions as to the rights of parties to actual controversies if that answer will terminate the controversy.

15.3    There exists between Plaintiffs and the named Defendants an actual controversy relating to whether any of the named Defendants and/or their agents have ever had any legal, nominal, or equitable rights in the Loan, or any legal, nominal or equitable ownership in the beneficial interests of the Loan, nor any legal right to pursue foreclosure, whether judicial or non-judicial, against Plaintiffs' Property.

15.4    The Court should issue an order adjudicating the controversy set forth in this cause of action in favor of Plaintiffs and award attorney fees and costs to Plaintiffs under statute.

15.5    Plaintiffs are entitled to recovery of attorney's fees and costs of litigation for bringing this cause of action.

## XI.    Eleventh Cause of Action - Declaratory Judgment as Lack of Standing of Defendants
### (AGAINST ALL DEFENDANTS)

16.1    Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 15.5.

16.2    Plaintiffs re-allege and re-incorporate by reference all proceeding paragraphs fully set forth herein.

16.3    An actual controversy has arisen and now exists between Defendants and Plaintiffs regarding their respective rights and duties, in that Plaintiffs contend that Defendants do not have the right to foreclose on the Property because Defendants have failed to perfect any security interest on the Property.

**COMPLAINT - 25**

PENFIELD LEGAL SERVICES, PLLC
11661 SE 1ST STREET, SUITE 100
BELLEVUE, WA 98005
888-543-0048

16.4    The reported power of sale by the Defendants no longer applies.  Plaintiffs further contend the Defendants and each of them do not have the right to foreclose on the Property because Defendants did not properly comply with the terms of the Defendants' own PSAs that governed the securitization of the Loan and falsely or fraudulently prepared documents required for Defendants to foreclose as a calculated and fraudulent business practice.

16.5    Plaintiffs are informed and believe that and thereupon allege that the only individual or entity that has standing to foreclose is the holder of the note because only the holder has a beneficial interest.

16.6    Plaintiffs request that this court find that the reported power of sale contained in the Note and in the DOT has no force and effect at this time, because Defendants actions in processing, handling and attempting foreclosure of the Loan involve numerous fraudulent, false, deceptive and misleading practices, including, but not limited to, violations of state and federal laws designed to protect borrowers, which has directly caused Plaintiffs to be at an equitable disadvantage to the named Defendants.

16.7    Plaintiffs further request that the title to the Property remain in their name during the pendency of this litigation and deem that any attempted sale of the home the Property will be unlawful and void.

16.8    Plaintiffs are entitled to recovery of attorney's fees and costs of litigation for bringing this cause of action.

## XII.    Twelfth Cause of Action - Declaratory Judgment as to Lack of MERS' Ability to Be a Real Party in Interest in a Securitized Loan
### (AGAINST DEFENDANT MERS)

17.1    Plaintiffs re-allege and re-incorporate by reference the allegations in paragraphs 1.1 through 16.8.

**COMPLAINT - 26**

PENFIELD LEGAL SERVICES, PLLC
11661 SE 1ST STREET, SUITE 100
BELLEVUE, WA 98005
888-543-0048

17.2    When Plaintiffs' Note and DOT was created Defendant MERS was named as the "nominal beneficiary" on the DOT.  Plaintiffs are informed and believe and thereon allege that Defendant MERS lacks authority under its corporate charter to foreclose a mortgage, or to own or transfer an interest in the Loan because MERS' charter limits MERS' powers and duties to functioning as an electronic registration system for certain types of securities.

17.3    Plaintiffs are informed and believe and thereon allege that in order to conduct a foreclosure action, a person or entity must have standing.

17.4    The Note in this action identifies the entity to whom it is payable, WAMU, as payee. Therefore, the Note herein cannot be transferred unless it is endorsed.  Upon information and belief, Plaintiffs allege that the Note has been properly endorsed, and there is no evidence whatsoever that the proper endorsements were made nor are there any other notices which establish that WAMU endorsed and the Note to another party.

17.5    It is well established Federal and state law that the assignment of a DOT does not automatically assign the underlying Note and the right to be paid on the Note to the assignee.

17.6    To perfect the transfer of the Note as collateral for a debt, the owner must deliver the Note to the transferee.

17.7    Without this transfer, the sale of the Note is invalid as a fraudulent conveyance, or remains unperfected and therefore uncollectible.

17.8    The Note herein specifically identifies the party to whom it was payable, WAMU and the Note, therefore, cannot be transferred unless it is properly endorsed.

17.9    Upon information and belief, Plaintiffs allege that the Note was not transferred by WAMU to WAMU, the alleged Trustee of the unknown Trusts that WAMU now claims hold the Loan and DOT.

17.10    Defendants, and each of them, cannot produce any evidence that the Note has been transferred; therefore, Defendant MERS could only transfer whatever interest it had in the DOT. The Note and DOT are inseparable; an assignment of the Note carries the mortgage (i.e., DOT) with

**COMPLAINT - 27**

it, while an assignment of the DOT alone is a nullity. Therefore, if one party receives a Note and another party receives the DOT, as in this case, the holder of the Note prevails regardless of the order in which the interest was transferred.

17.11   Defendant MERS has failed to submit documents authorizing MERS, as beneficiary for the original lender, to assign the subject mortgage.

17.12   In the instant action, MERS, as a mere "nominal" beneficiary for WAMU, not only lacks authority to assign the Loan, but cannot demonstrate that WAMU  had knowledge of or assented to the assignment by MERS to any other entity.  Any attempt to transfer the beneficial interest of a DOT without actual ownership of the underlying Note is void. Therefore, WAMU, CHASE, and MERS, cannot establish that they are entitled to assert a claim in this case.  For that reason as well as other reason set forth below, MERS cannot transfer an interest in real property and cannot recover anything from the Plaintiffs.

17.13   The Defendants and each of them through actions alleged above have illegally commenced foreclosure under the note on the home, supported by false or fraudulent documents. Said unlawful foreclosure action has caused and continues to cause Plaintiffs great harm and irreparable injury and that real property is unique.

17.14   The wrongful conduct of the Defendants, unless restrained or enjoined by an order of this Court, will continue to cause great and irreparable harm to the Plaintiffs. Plaintiffs will not have the beneficial use or enjoyment of their home and will lose their home.

17.15   Plaintiffs have no other plain, speedy or adequate remedy and the injunctive relief prayed for below is necessary and appropriate at this time to prevent irreparable loss to the Plaintiffs.  Plaintiffs have suffered and will continue to suffer in the future unless Defendants' wrongful conduct is restrained and enjoined because real property is inherently unique and will be impossible for the Plaintiffs to determine the precise amount of damage they will suffer.

17.16   Plaintiffs are entitled to recovery of attorney's fees and costs of litigation for bringing this cause of action.

**COMPLAINT - 28**

## XIII. Thirteenth Cause of Action – Quiet Title

### (AGAINST ALL DEFENDANTS)

18.1    Plaintiffs re-allege and re-incorporate by reference all of the foregoing allegations as though fully set forth herein.

18.2    WAMU and Defendants CHASE and MERS have engaged in multiple sales of the Note to different entities, both in the United States and overseas, without adhering to the requirements to protect the security interest in that Note by timely and properly assigning the DOT to the rightful holder of the Note. As a result, the Note and DOT have been forever separated and the Note is no longer secured by the DOT to Plaintiffs' property.

18.3    The Plaintiffs are entitled to an order of this Court quieting title to the contested Property in their favor, and extinguishing all rights and claims of the named Defendants in this action to any claim upon the subject real property. The Plaintiffs assert their right to clear title, as a fee simple interest, free of any encumbrances that have been asserted by the defendants in this action.

18.4    Plaintiffs are entitled to recovery of attorney's fees and costs of litigation for bringing this cause of action.

### G.    Prayer for Relief

WHEREFORE, Plaintiffs pray for a Judgment, joint and severally as follows:

A.    That Defendants CHASE, and  MERS, and all of their agents and associated companies, be forever barred from having or asserting any right, title, estate, lien, or interest in or to the Property herein described adverse to Plaintiffs;

B.    That judgment be entered against Defendants CHASE, and MERS, and all of their agents and associated companies, joint and severally, for all damages in an amount to be proven at the time of trial;

**COMPLAINT - 29**

**PENFIELD LEGAL SERVICES, PLLC**
11661 SE 1ST STREET, SUITE 100
BELLEVUE, WA 98005
888-543-0048

C.      That the actions of Defendants CHASE, and  MERS, and all of their agents and associated companies were unfair and deceptive business practices in violation of RCW 19.86 et seq. and that this Court award all such relief to Plaintiffs as they may be entitled, including treble damages and an award for costs and attorney fees;

D.      That the Court render, between Plaintiffs and Defendants CHASE, an accounting determining the amount, if any, actually owed to Defendants by Plaintiffs;

E.      That the Plaintiffs be awarded consequential damages, including attorney's fees and costs incurred to bring this action and all other attorney's fees in pursuing the actions against Defendants CHASE, and  MERS, and all of their agents and associated companies described more particularly in the Complaint, in an amount to be proven at trial;

F.      That the Plaintiffs have such other and further relief as may be just and equitable.

DATED this 15th day of January, 2013.


PENFIELD LEGAL SERVICES, PLLC


By: /s/ Robert J. Penfield
        Robert J. Penfield, WSBA #25081
        11661 SE 1st Street, Suite 100
        Bellevue, Washington 98005
        Telephone: (888) 543-0048
        Fax: (425) 650-6912
        E-mail: Robert@penfieldlegal.com
        Attorney for Plaintiffs


**COMPLAINT - 30**